DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment entered by the Scioto County Common Pleas Court, upon a bench trial, in favor of The Living Waters Fellowship, Inc., plaintiff below and appellee herein, on its claim against Nancy and Donald Ross, defendants below and appellants herein. The following errors are assigned for our review:
 FIRST ASSIGNMENT OF ERROR: "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY GRANTING LIVING WATERS SPECIFIC PERFORMANCE BECAUSE THE STATUTE OF FRAUDS BARS AN ORAL CONTRACT TO PURCHASE REAL ESTATE."
 SECOND ASSIGNMENT OF ERROR: "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY GRANTING LIVING WATERS SPECIFIC PERFORMANCE UNDER THE DOCTRINE OF PART PERFORMANCE."
 THIRD ASSIGNMENT OF ERROR: "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY FAILING TO APPLY THE PROPER BURDEN OF PROOF TO EACH ESSENTIAL ELEMENT OF PART PERFORMANCE AND THE FORMATION OF A VALID CONTRACT."
 FOURTH ASSIGNMENT OF ERROR: "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY GRANTING LIVING WATERS SPECIFIC PERFORMANCE UNDER THE DOCTRINE OF ESTOPPEL."
 FIFTH ASSIGNMENT OF ERROR: "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY AWARDING LIVING WATERS SPECIFIC PERFORMANCE BECAUSE LIVING WATERS COULD ADEQUATELY BE COMPENSATED IN DAMAGES."
 SIXTH ASSIGNMENT OF ERROR: "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY AWARDING LIVING WATERS SPECIFIC PERFORMANCE BECAUSE THERE WAS NOT A DEFINITE, SPECIFIC DESCRIPTION OF THE PROPERTY."
 SEVENTH ASSIGNMENT OF ERROR: "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY AWARDING LIVING WATERS SPECIFIC PERFORMANCE EVEN THOUGH THERE WAS NO EVIDENCE THAT DONALD ROSS AUTHORIZED THE ALLEGED ORAL AGREEMENT."
A brief summary of the facts pertinent to this appeal is as follows. Appellants are the owners of a 2.06 acre parcel of real property located at 10 Arrowhead Drive in Portsmouth, Ohio. The Living Waters Fellowship, Inc. (hereinafter "Living Waters") is a religious nonprofit organization incorporated, and originally based, in Tucson, Arizona. Living Waters moved its operation to Scioto County in 1986 and began renting a warehouse building on appellants' property for "weekly" church services and meetings. These "weekly" rentals became more frequent over the years and, in 1992, the parties culminated their business dealings with Living Waters taking full time possession of most of the building.[1] Each side, however, had a very different view of the manner by which this arrangement came about.
Appellant, Nancy Ross, recalls the situation as simply a lease agreement whereby she and her husband agreed to rent all of the building (except that part which she was using as storage for her business) to Living Waters in exchange for rental payments of $800 per month. Ms. Ross concedes that there were talks about selling the building, but maintains that such talks never came to fruition and that a firm sale was never finalized. Living Waters, on the other hand, claims that it had an oral agreement to buy the property on a land contract. The church's two (2) pastors, Dickie and Steve Butts, asserted that they negotiated to buy the facility for $206,000 at 9 1/2% interest with appellants to "carry the paper" on the sale. They further recalled that the amortized payments were to be approximately $1,600 per month and that the $800 per month that the church began paying in 1992 included a credit of $800 for that portion of the building which appellants were using as storage.[2]
Unfortunately, no writing exists between these parties to expressly show the nature of their relationship. Even more unfortunately, over time appellants and Living Waters began having problems dealing with one another. Appellants made an attempt to raise the "rent" on the building and, when the church would not come forward with the extra money, shut off the utilities. The church retaliated at one point by changing the locks on the building to keep appellants from entering the portion of the building that it was using for its religious services.
Living Waters commenced the action below on January 13, 1999, alleging that it had an agreement to purchase the subject property and that appellants had breached that agreement. The church further alleged that it made "significant improvements" to the building and increased its value by approximately $50,000. Living Waters asked for specific performance of the sale contract as well as its "actual damages" and other relief.
Appellants filed an answer denying that any contract to sell the subject premises existed and asserted a variety of affirmative defenses including, inter alia, that any alleged oral contract for the sale of real estate was barred by the statute frauds. They also filed a counterclaim alleging that they had an oral lease agreement with Living Waters to rent the subject premises for $800 per month. Appellants further averred that they had increased the rent, to $1,100 per month in 1996 and $1,600 per month in 1998, but that the church never paid anything more than the original $800 rental payment. They asked for damages in the amount of (1) $10,500 for back rent from 1996 to 1998, (2) $2,400 per month rent for as long as Living Waters occupied the premises after December of 1998 and (3) $1,400 per month in lost rent for the property until such time as the church vacated the premises.[3] Living Waters filed a reply denying any liability on the counterclaim.
The matter came on for a bench trial over several days in November of 1999, during which time each side presented starkly different pictures of their dealings with one another. Mr. and Mrs. Butts both testified that they had negotiated for the church to purchase the building from appellants on a land contract for $206,000 at 9 1/2% interest.[4] They further testified that Nancy Ross continually rebuffed their attempts to formalize that agreement into a written contract.[5]
The pastors, along with several other members of their congregation, also explained how they spent considerable time and money to improve the building. These witnesses stated that they would never have made those improvements had they believed that the church merely rented the facility in question. John Kizer, a local real estate appraiser, opined that the improvements had increased the value of the building by $25,000 to $30,000 and that the property in general had appreciated from approximately $200,000 in 1992 (when Living Waters took possession) to $280,000 at the time of the proceedings below.
Nancy Ross testified that the parties had no firm agreement to sell the property to Living Waters. She explained that although they had tentatively agreed on price and other terms of sale, she ultimately decided against the transaction on the advice of her attorney and because she did not want to "deal" with the church. Admitting that she and her husband had received numerous offers from other individuals interested in buying the property, Ms. Ross characterized the church as "bloodsuckers" who were "putting a gun to [her] head" trying "to force [her] to sell the property."
With respect to the property improvements made by Living Waters, Ms. Ross gave somewhat contradictory testimony. First, she claimed that she was unaware of most of the work and that the work was done without her permission. She later testified, however, that the $800 monthly rental for the building was purposely set below market and was extended to the church on the condition that Living Waters "upgrade the building." In any event, Ms. Ross strongly contested the value of the improvements. Sandy Sinclair, another real estate appraiser, testified on appellants' behalf and opined that the value of the property had only been enhanced by roughly $3,500.
The matter was taken under advisement and both sides filed extensive post-trial briefs addressing the various issues raised below. A decision and judgment was entered on March 24, 2000, finding in favor of Living Waters on its complaint. The trial court ruled that the church had shown, by clear and convincing evidence, the existence of an oral contract for the sale of the subject property for the sum of $206,000. The court also ruled that such contract was removed from operation of the statute of frauds by virtue of "part performance and estoppel." It was further determined that Living Waters was entitled to specific performance of the sales contract and, after adjusting for the amounts already paid thereon since 1992, the court ordered appellants to convey the property to the church and ordered Living Waters to pay to appellants the remaining balance of $199,795 on the contract. The court gave a brief, generalized description of the real property to be conveyed as part of its judgment and then ordered appellants to prepare a survey with a more formal metes and bounds legal description "to correspond to [that description] within 30 days of the date of [that] entry."[6] This appeal followed.
 I
Before addressing the assignments of error on their merits, we first pause to consider a threshold jurisdictional problem. Appellate courts in Ohio have jurisdiction to review the final orders or judgments of inferior courts within their district. See Section 3(B)(2), Article IV of the Ohio Constitution; also see R.C. 2501.02. A final order is one whichinter alia affects a substantial right and in effect determines the action. R.C. 2505.02(B)(1). The operative effect of such an order is that it determines the entire case, or a distinct branch thereof, such that it will not be necessary to bring the cause before the court for any further proceedings. See Lantsberry v. Tilley Lamp Co. (1971), 27 Ohio St.2d 303,306, 272 N.E.2d 127, 129; Teaff v. Hewitt (1853), 1 Ohio St. 511, 520;also see Simms v. Heskett (Mar. 3, 2000), Athens App. No. 99CA28, unreported; Coey v. U.S. Health Corp. (Mar. 18, 1997), Scioto App. No. 96CA2439, unreported. If the judgment is not final and appealable, then an appellate court has no jurisdiction to review the case and it must be dismissed. Prod. Credit Assn. v. Hedges (1993), 87 Ohio App.3d 207, 210,621 N.E.2d 1360, 1362, at fn. 2; Kouns v. Pemberton (1992),84 Ohio App.3d 499, 501, 617 N.E.2d 701, 702.
The decision and judgment entry of March 24, 2000, directs the appellants to prepare a survey and legal description of the property to be conveyed. There is no indication in the record that this was ever done and, until such time as it is, there is the potential for further proceedings before the trial court to resolve any conflicts over the precise location and description of the property to be conveyed. One could thus argue that the judgment is not final and appealable until those issues are resolved and the property is transferred.
We ultimately reject that argument, however, because the preparation of the survey and its accompanying legal description are merely ministerial functions. The trial court has already determined that there was an oral contract between the parties, that such contract was enforceable notwithstanding the statute of frauds and that Living Waters is entitled to specific performance thereon. This determination clearly affects substantial rights of the parties and, for all intents and purposes, determines the major issues in the action if not the action in its entirety. The only matter left to be resolved is the precise metes and bounds description of the property being transferred. This does not make the judgment interlocutory for purposes of R.C. 2505.02. With that in mind, we turn our attention to the merits of the case.
 II
We first consider, out of order, the seventh assignment of error wherein appellants argue that the trial court erred in entering judgment against them because "there was no evidence that Donald Ross had authorized the alleged oral agreement" for sale of the warehouse building to the church. Our analysis of this argument begins from the standpoint that the judgment below will not be reversed so long as it is supported by some competent and credible evidence. See Shemo v. Mayfield Hts.
(2000), 88 Ohio St.3d 7, 10, 722 N.E.2d 1018, 1022; Vogel v. Wells
(1991), 57 Ohio St.3d 91, 96, 566 N.E.2d 154, 159, C.E. Morris Co. v.Foley Construction Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, at the syllabus. We acknowledge that the weight to be given the evidence and the credibility to be afforded the witnesses were issues to be determined by the trial court as the trier of fact, see Cole v. Complete Auto Transit,Inc. (1997), 119 Ohio App.3d 771, 777-778, 696 N.E.2d 289, 293, and that the court was free to believe all, part or none of the testimony of each witness who appeared before it. See Rogers v. Hill (1998),124 Ohio App.3d 468, 470, 706 N.E.2d 438, 439; Thornton v. Parker
(1995), 100 Ohio App.3d 743, 751, 654 N.E.2d 1282, 1287; Stewart v. B.F.Goodrich Co. (1993), 89 Ohio App.3d 35, 42, 623 N.E.2d 591, 596. This is a highly deferential standard of review, see Barkley v. Barkley (1997),119 Ohio App.3d 155, 159, 694 N.E.2d 989, 992, and appellants have a heavy burden to carry in demonstrating that a reversal of the trial court's judgment is warranted. However, after a careful review of the transcript and the evidence adduced below, we conclude that appellants met that burden in the case sub judice and that the judgment should be reversed. Our reasoning is as follows.
It was uncontroverted during the proceedings below that Donald Ross owns an undivided one-half (1/2) interest in the subject premises. While the record is sufficient to support the trial court's finding that Nancy Ross and Living Waters entered into some sort of oral agreement for the sale of the property, there is no evidence whatsoever to show that Donald Ross was a party thereto. It is evident that if more than two (2) persons are intended to be parties to a proposed contract, the contract does not come into existence unless all of them manifest their assent. Calamari 
Perillo, Contracts (1977 2d. Ed.) 23, § 2-1. There is simply no evidence in this case that Donald Ross assented to the sale of his interest in the warehouse building and, thus, Living Waters is not entitled to the conveyance of that property.
The church counter argues by citing to the deposition of Nancy Ross wherein she stated that her husband "pretty much" left his share of their business affairs "up to [her]." Living Waters contends that this evidence is sufficient to show that Donald Ross should be bound to the oral contract. We disagree. First, we note that this is a comment made at deposition rather than trial, and thus does not carry the same weight as a statement made at trial.[7] Second, the general decision to leave one's business affairs "up to" one's spouse is not the same as manifesting an assent to the sale of real property. There must be some express indication (e.g. a power of attorney) that Nancy Ross possessed the authority to bind her husband to a sales contract for this real property. Third, even assuming arguendo that Donald Ross could lawfully give his wife verbal authority to bind him to an oral contract, we believe that the evidence of such authority should be given by Mr. Ross himself rather than by his would be agent. We believe that a contrary view would unleash a host of problems were we to hold that an agent could establish verbal authority to transfer real estate simply on the basis of his or her own testimony.
The church responds by pointing out that it entered into a stipulation on September 10, 1999 whereby it agreed not to call Mr. Ross as a witness during these proceedings. Living Waters contends that it was "induced" to enter this stipulation because of some unexplained "disability" on the part of Mr. Ross and, as a result, we should disregard any requirement that he must have expressly agreed to the oral contract. We are not persuaded. A party cannot be bound to a contract to which he has not assented, and no degree of inequity in the facts and circumstances of a given case will induce us to abandon this fundamental and bedrock principle of contract law.
That is not to say that we are unsympathetic to the plight of Living Waters. The testimony of Dickie and Steve Butts, if found to be credible, and apparently it was, tends to portray Ms. Ross as a shrewd, manipulative individual who strung the church along on the promise of a written contract all the while keeping her options open to deal with other entities. There was also sufficient evidence adduced below to demonstrate that the church justifiably relied on Ms. Ross's representations to its substantial detriment. Be that as it may, this Court simply cannot allow the transfer of Mr. Ross's interest in the property without some indication that he, too, was involved in those misrepresentations. Appellants' seventh assignment of error is therefore sustained, albeit reluctantly.
Having so ruled, the judgment of the trial court is hereby reversed. The remaining six (6) assignments of error, which also address the propriety of awarding specific performance, are rendered moot and will be disregarded pursuant to App.R. 12(A)(1) (c). The cause sub judice is remanded for further proceedings to determine what damages, if any, are warranted on the church's complaint.
 JUDGMENT ENTRY
It is ordered that the judgment be reversed and this cause be remanded for further proceedings. Appellants shall recover of appellee costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, J.: Dissents with Dissenting Opinion, Kline, P.J.: Concurs in Judgment Opinion.
 ___________________________ Peter B. Abele, Judge
[1] Appellants retained the other portion of the building wherein they apparently stored the inventory for Nancy Ross's "tupperware" business.
[2] Although appellants were to originally vacate the portion of the building that they were using as storage within two (2) years, it would appear from the record that this never happened and that they still occupied that portion of the facility at the time of the proceedings below.
[3] It is not entirely clear how appellants arrived at the $2,400 per month rent figure, but the $1,400 per month for loss of rent pertained to their failure to consummate a proposed lease of the warehouse to the Frito Lay company (for $1,400 per month) because the church had not vacated the premises.
[4] It was uncontroverted below that any sale of the property would have been by means of a land contract so that appellants could have deferred their capital gains tax liability by means of the installment sales provisions of Section 453, Title 26, U.S. Code.
[5] This was apparently a common tactic used by Nancy Ross when conducting business. In addition to the church building, Mr. and Mrs. Butts also bought a residential home from appellants on an "oral land contract." The Butts's pressed for a written agreement to memorialize the sale, but were rebuffed for some time as appellants continued to make use of a shed and a garage that were located on the property. Eventually, after two (2) years of making payments on the oral agreement, a written contract for sale of the home was finalized.
[6] The subject property, as mentioned previously, consists of 2.06 acres. However, the acreage was not to be sold in its entirety. Ms. Ross testified that the parties were negotiating for the sale of only 1 acre of land and Ms. Butts claims that the church was attempting to buy 1 1/2 acres. Thus, a survey would be required to show the precise amount and location of the land being transferred between these parties.
[7] The underlying rationale for giving great deference to the trial court's factual findings is that, as trier of fact, the court is better able than a reviewing court to view the witnesses and observe their demeanor, gestures and voice inflections and use those observations in weighing the credibility of the proffered testimony. See Myers v. Garson
(1993), 66 Ohio St.3d 610, 615, 614 N.E.2d 742, 745; Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80. Obviously, the trial court does not have the same benefit of making those observations when reading deposition testimony.